IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
April 18, 2012 Session

## DERRANN WILLIAM ESTILL v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2007-A-25      J. Randall Wyatt, Judge**

**No. M2011-01313-CCA-R3-PC - Filed August 21, 2012**

The Petitioner, Derrann William Estill, appeals the Davidson County Criminal Court's denial of his petition for post-conviction relief from his conviction of especially aggravated kidnapping and resulting seventeen-year sentence. On appeal, the Petitioner contends that he received the ineffective assistance of counsel at trial and on appeal, that he is entitled to relief based upon cumulative error, and that the post-conviction court failed to address adequately his claims of due process violations. Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the Court, in which ALAN E. GLENN and ROGER A. PAGE, JJ., joined.

Susan L. Kay, Jake R. Hayes, and Nadia S. Mozaffar, Nashville, Tennessee, for the appellant, Derrann William Estill.

Robert E. Cooper, Jr., Attorney General and Reporter; Clark B. Thornton, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Amy Eisenbeck, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

### I. Factual Background

We glean the following relevant facts from this court's opinion in the Petitioner's direct appeal:

The appellant was charged with especially aggravated

kidnapping and domestic assault against his wife, Robin Rogers. Just prior to opening statements at trial, the appellant pled guilty to domestic assault. He proceeded to trial on the remaining charge.

Lieutenant Andrea Swisher testified that in August 2006, she was a sergeant with the Metropolitan Nashville Police Department and was assigned to the Domestic Violence Division. Shortly after 6:00 p.m. on August 26, Lieutenant Swisher was on patrol and received "a serious call for service." She went to the scene of the reported incident but did not see anything. Another officer arrived and reported that he also had not seen anything suspicious. Lieutenant Swisher received an incident update over her police radio and was directed to another location. The suspect vehicle, a pickup truck, was supposedly "headed outbound on Murfreesboro Road." Lieutenant Swisher drove in that direction and began looking for the truck. She learned the truck had turned onto the Trevecca University campus, so she turned into an entrance gate that was usually closed. She noticed the gate was open, looked onto a side street, and saw the pickup truck. She got out of her patrol car, drew her weapon, and ordered the truck's driver, who was the appellant, onto the ground. Lieutenant Swisher held him at gunpoint until another officer arrived.

Lieutenant Swisher testified that she heard the victim crying hysterically inside the truck. She approached the vehicle and saw the victim lying on her back on the passenger side. The victim's hands were tied together, and her hands were tied to her feet. The victim could not move and said, "[P]lease help me, please help me." Lieutenant Swisher crawled into the truck and tried to untie the electrical cord that was binding the victim. However, the cord was too tight, so Lieutenant Swisher borrowed a knife from another officer and cut the cord off the victim. She noticed that the truck's back window was in the bed of the truck.

Lieutenant Swisher testified that after she helped the victim out of the truck, she saw an open knife on the passenger seat. The victim had been lying on the knife, and Lieutenant

Swisher asked the victim if she was injured. The victim "started pointing out . . . areas that were . . . hurt," and Lieutenant Swisher took photographs. The victim said that the appellant had hit her on the top of her head with his fist and that her head was hurting. Lieutenant Swisher looked for a bump on the victim's head and saw blood in the victim's hair. The victim lifted her shirt, and Lieutenant Swisher saw a bite mark on the victim's back. The victim also had ligature marks on her arms and legs. Lieutenant Swisher said the appellant acted arrogant in that he did not believe he had done anything wrong. During the appellant's booking process, Lieutenant Swisher told him that he was going to be charged with kidnapping, and the appellant responded, "[S]he's the one that kidnapped me."

Lieutenant Swisher informed the victim about obtaining an order of protection against the appellant, but the victim did not want one. The victim also did not want to go to a hospital, so a detective drove her home. Lieutenant Swisher acknowledged that none of her reports mentioned that the appellant was arrogant or that he claimed the victim kidnapped him. She also acknowledged that the victim told her the appellant only used the knife to remove the truck's rear window. Lieutenant Swisher did not check the appellant for injuries.

. . . .

The victim testified that she had known the appellant for only a couple of months before they married on July 10, 2006. On August 26, 2006, the victim and the appellant lived together in Nashville. She said that the incident in question began about 4:00 a.m. and that the appellant's personality "would change about that time every day." The appellant began arguing with the victim and threatening her.[1] Suddenly, the appellant gave the victim the keys to the pickup truck and said, "[W]ell, let's go." The victim got into the truck and locked all the doors. She said she was trying to get away from the appellant because she "didn't want to go through it again." As the victim was backing

---

[1] We note that according to the trial transcript, the victim testified, "And he just started looking at me, saying, be safe, you better be safe, just be safe, don't -- you know, just kind of threatening words."

the truck out of the driveway, the appellant jumped into the bed of the truck. The victim began driving "a little wild," trying to get the appellant out of the truck. The victim stopped the truck and told the appellant to get out, but he refused. The victim was scared and continued driving. The appellant "popped out" the truck's back window and bit the victim on her back, leaving a scar. He also hit the victim on the top of her head with his fist several times.

The victim testified that the appellant climbed into the truck, pulled her out of the driver's seat, and put her onto the passenger seat. The victim said that "the next thing I knew I was hogtied." She could only turn her head and "thought that was going to be the end of it." She then heard a police officer say, "[S]top, get out of the truck with your hands up." The appellant got out, and the victim said, "Help me." The victim was crying and devastated, and Lieutenant Swisher took photographs of the victim while she was tied. When the officer untied the victim, the victim discovered that the knife had been "up under me." She said she did not remember seeing the appellant with the knife and that she could not remember "if I seen him with the knife trying to pop the window out." She said she was not worried about the knife because she was "more worried about him." When asked if the appellant possessed the knife prior to entering the truck, the victim said, "I think he had it on him, because he carried it a lot." Lieutenant Swisher took photographs of the victim's injuries, including the bite mark on her back, and told her about obtaining an order of protection. However, the victim was not interested in obtaining an order. She acknowledged that she was convicted of aggravated assault in 1998.

On cross-examination, the victim testified that she thought she saw the knife when the appellant opened the rear window but that she was not sure. The appellant did not cut the victim, did not waive the knife in her face, and did not threaten her with the weapon. The victim did not know how the knife ended up underneath her on the passenger seat. She said that the incident may have started at 4:00 p.m., not 4:00 a.m., and that she and the appellant were arguing about being out of crack

-4-

cocaine and not having money to buy more. They had been using drugs throughout the day, and the victim also had been drinking beer. The victim acknowledged that drug use could make a person emotional and disoriented.

The victim testified that about three weeks prior to this incident, she was admitted to Baptist Hospital because the appellant tried to suffocate her by putting his hands over her mouth. She denied that she was admitted to the hospital for a drug overdose and said that the appellant told the hospital staff she tried to kill herself by taking a drug overdose. However, she acknowledged that drugs were in her system and stated that if a doctor said she overdosed, then "that's what it is, I guess." She denied being on drugs at trial or being under psychiatric care. She said she did not obtain an order of protection against the appellant, that she did not want to hurt him, and that she "just wanted to go home and get away from him."

On redirect examination, the victim testified that she was not "high" on drugs when the appellant kidnapped her and that she did not feel intoxicated. Initially, the victim claimed she spent six or seven days in Baptist Hospital during the prior incident, but she later acknowledged that she may have spent only three days in the hospital.

State v. Derrann William Estill, No. M2007-02782-CCA-R3-CD, 2009 Tenn. Crim. App. LEXIS 531, at **2-9 (Nashville, July 7, 2009).

On direct appeal, the Petitioner claimed that (1) the trial court erred by failing to define "possession" adequately when the jury requested a definition during jury deliberations, (2) the evidence was insufficient to support the conviction, and (3) his sentence was excessive. Id. at **1-2. Finding no reversible error, this court affirmed the appellant's conviction and sentence. Id. at *2. Our supreme court denied the Petitioner's application for permission to appeal. State v. Derran William Estill, No. M2007-02782-SC-R11-CD, 2009 Tenn. LEXIS 803 (Nashville, 2009).

The Petitioner filed a timely petition for post-conviction relief, arguing that he received the ineffective assistance of counsel at trial and on appeal. The post-conviction court appointed counsel, and counsel filed an amended petition. In the amended petition, the Petitioner claimed, in relevant part, that he received the ineffective assistance of counsel at

trial because (1) he did not have an opportunity to participate in jury selection, (2) counsel failed to inspect the pickup truck before it was sold at police auction, (3) counsel failed to present evidence to the jury about his mental health, (4) counsel did not present any evidence on his behalf, and (5) counsel failed to cross-examine the victim effectively about her drug use and about her being in the hospital previously for a drug overdose. The Petitioner also claimed that he received the ineffective assistance of counsel on direct appeal because counsel failed to communicate sufficiently with him and failed to raise the following issues: (1) the trial court should have ruled that his 2001 theft conviction was inadmissible for impeachment purposes; (2) the trial court erred by denying his motion to suppress his statement, "She kidnapped me"; (3) the victim's testimony that the Petitioner threatened her by saying, "[B]e safe, you better be safe," was inadmissible pursuant to 404(b), Tennessee Rules of Evidence; (4) Lieutenant Swisher improperly testified that the victim suffered from domestic violence syndrome; and (5) during closing arguments, the defense allowed the State to define "possession" improperly and refer to the Petitioner's guilty plea for domestic assault. Finally, the Petitioner claimed that the State's failure to preserve the truck as evidence, the State's allowing Lieutenant Swisher to testify about the victim's suffering from domestic violence syndrome, the trial court's failure to instruct the jury properly on "possession," and the insufficiency of the evidence violated his rights to due process.

At the evidentiary hearing, the then fifty-seven-year-old Petitioner testified that he served in the U.S. Navy from 1970 to 1975 and was still married to the victim. Prior to his arrest in this case, the Petitioner did not work because he was disabled due to a "bad back" and memory loss. After the Petitioner's arrest, the police impounded his pickup truck. Trial counsel met with the Petitioner twice, and the Petitioner told counsel to inspect the truck. The victim had claimed that she received a concussion from hitting the truck's windshield, and the Petitioner wanted counsel to look for blood spots and broken glass in the truck. He said he also wanted counsel "to get measurements from seat to seat where the knife was supposed to have been." However, the Petitioner learned the truck had been sold at a police auction. The Petitioner said that after he learned the truck had been sold, he went on a hunger strike because he was not receiving the representation he deserved. The hunger strike lasted about three weeks. During the strike, trial counsel offered to visit the Petitioner if he would end the strike. The Petitioner stopped the hunger strike, and counsel met with him twice before trial.

The Petitioner testified that during jury selection, he sat "[o]n the far end to the right" and did not participate. He said that some teachers were dismissed from the panel and that he thought they "would be pretty good." He stated that a judge and some "welfare women" were on the jury and that he did not want them as jurors. At the time of his arrest, the Petitioner was taking stress pills, muscle relaxers, and sleeping pills. He said that a 1997 car accident had "messed up" his memory and speech and that trial counsel had him evaluated

by a psychiatrist. The psychiatrist concluded that the Petitioner had problems with anger management and control, but trial counsel did not present any evidence about the Petitioner's mental health to the jury. On the morning of trial, the Petitioner was very sick and had a fever. He did not receive any medication for his illness and thought the trial would be postponed, but counsel wanted to proceed.

The Petitioner testified that counsel should have called Leah White, the victim's friend, to testify about the victim's drug problem. He said the owner of the pickup truck and the police officer who transported the Petitioner to jail also should have testified. The police officer could have testified that the Petitioner did not have any identification on his person and was not wearing shoes at the time of his arrest, which supported the Petitioner's claim that he did not kidnap the victim. The Petitioner said that when trial counsel cross-examined the victim, "they didn't got into specifics" with her and did not ask about her drug use. The jury never received a definition of "possession." The Petitioner never met with appellate counsel but wrote a letter to counsel and talked with him twice on the telephone.

On cross-examination, the Petitioner acknowledged that he talked with trial counsel three times in court. Between those court dates, counsel met with him twice in jail. The Petitioner acknowledged that he gave counsel the names of some witnesses and that counsel investigated witnesses. However, counsel did not investigate all of his witnesses. He said that he was diagnosed with stress and uncontrollable anger issues but that he did not know the specific name of his mental health diagnosis. The Petitioner acknowledged that he had never been involved in jury selection previously but said that "[y]ou can look at people and judge them, I think." On the day of trial, the Petitioner told trial counsel that he was sick and not feeling well. He said that although he did not tell the trial court about his illness, his telling counsel "should have been enough." He said that he did not know about the victim's drug use before he married her and that he learned in jail she also had a history of prostitution. He acknowledged that when Lieutenant Swisher found the victim, the victim's hands were tied. When asked how the victim's hands became tied, the Petitioner answered, "I think I did it." The Petitioner acknowledged that although appellate counsel never met with him, counsel had access to his file.

Appellate counsel testified for the Petitioner that he was an assistant public defender and took over the case after the trial court denied the Petitioner's motion for new trial. Appellate counsel said that he did not talk with the Petitioner but that he talked with trial counsel "[quite] a bit" about the case. Although appellate counsel could not remember any specific conversations with trial counsel, he said that he always talked with a defendant's trial attorney during his preparation of the defendant's appellate brief. On direct appeal, appellate counsel raised sufficiency of the evidence, sentencing, and the jury instruction on "possession." Appellate counsel did not raise as error the admissibility of the Petitioner's

prior theft conviction because the Petitioner did not testify at trial and because trial counsel did not make an offer of proof regarding the Petitioner's proposed testimony. Appellate counsel said that the offer of proof should have been made during the trial or during the motion for new trial hearing and that "case law is pretty clear that without an offer of proof it would be very difficult for an appellate court to find reversible error." Regarding the Petitioner's statement to police that "she kidnapped me," the trial court had concluded that the Petitioner did not make the statement in response to police interrogation. Therefore, appellate counsel did not raise the issue on direct appeal. Appellate counsel also did not address on appeal the victim's testimony that the Petitioner told her, "[B]e safe." Although the victim had interpreted the Petitioner's statement as a threat, there was no evidence of prior bad acts by the Petitioner in conjunction with the statement. Therefore, appellate counsel did not argue on appeal that the statement was inadmissible under Rule 404(b), Tennessee Rules of Evidence. Appellate counsel said he did not think trial counsel objected to Lieutenant Swisher's testimony. Therefore, appellate counsel did not argue on appeal that the officer's testimony about domestic violence syndrome was inadmissible. Trial counsel also did not object to the improper definition of "possession" or the State's closing argument. Appellate counsel said he did not raise on appeal the State's failure to preserve the pickup truck because "I don't recall there being an issue raised about the truck prior to trial." Appellate counsel also did not address on appeal the Petitioner's mental state because he did not think the Petitioner's mental state was an issue at trial.

Trial counsel testified for the State that in 2006, she was an assistant public defender and began representing the Petitioner after his arrest. She met with the Petitioner one time in jail before his arraignment. The Petitioner began a hunger strike, so counsel visited him again to check on him. She said that she also saw the Petitioner on court dates and that she typically met with clients at least one time between court dates. She and/or co-counsel met with the Petitioner fourteen or fifteen times before trial. When asked if she and co-counsel discussed all of the issues with the Petitioner, she said, "I felt that we did the best that we could." Dr. Montgomery, a mental health professional, evaluated the Petitioner. Trial counsel said that the Petitioner had "potential brain injury problems" due to a car wreck and that she arranged for him to have "various brain scans." She said that she did not remember the Petitioner's official diagnosis but that his diagnosis had something to do with impulse control and anger management. The Petitioner's diagnosis did not produce a defense to the crimes, so defense counsel relied on the definition of "possession" and whether he possessed the knife as his defense. Trial counsel said that she did not remember jury selection in the Petitioner's case. She said that, typically, she and co-counsel asked the client to inform them of "concerns" the client had about potential members of the jury. She did not remember whether the Petitioner participated in discussions about jury selection. However, she said, "If a defendant doesn't want somebody on their jury[.] I don't argue with that I just take them off of the jury."

Trial counsel testified that she would have liked to have seen the Petitioner's pickup truck but that she discovered the truck had been sold. Trial counsel said that she found some photographs of the truck on an old police auction website and that "I think that was kind of the best that we could do at that point." Counsel filed a pretrial motion to prohibit the State from impeaching the Petitioner with his prior convictions. She acknowledged that she filed a motion to suppress the Petitioner's statement to police and said that she thought she also filed a motion to prohibit Lieutenant Swisher from testifying about domestic violence syndrome. Counsel recalled that the Petitioner had a runny nose at trial and needed a box of tissues. If he had been too ill to assist with his defense, trial counsel would have informed the trial court.

Trial counsel testified that she spoke with Leah White and someone named "Quentin" before trial and that they corroborated the Petitioner's information about the victim's drug addiction and erratic behavior. Their testimony would have been helpful if the victim had denied her drug use. However, the victim conceded at trial that she was a drug user and had been using drugs on the day of the crimes. Trial counsel said she cross-examined the victim and "would have cross-examined [the victim] to the extent allowed by the Court." Trial counsel stated that she asked the victim about the victim's drug use but that she did not remember if she asked the victim about the duration of a "high." The Petitioner may have wanted the officer who transported him to jail to testify. Trial counsel did not remember whether the State made a reference to the Petitioner's guilty plea to domestic assault during its closing argument. However, counsel was not sure a reference to the plea would have been objectionable.

On cross-examination, trial counsel acknowledged that eight months after the crimes, she asked the district attorney for permission to inspect the Petitioner's truck. However, the truck had been sold in December 2006, before the Petitioner was indicted. Trial counsel said that she did not remember if the Petitioner was taking medication before his arrest. Trial counsel raised the Petitioner's mental health issues at sentencing but not at trial. She also agreed that the Petitioner was visibly ill at trial. Trial counsel acknowledged that she may not have questioned the victim about how long a "crack high" lasted and that the defense presented no witnesses. Regarding the definition of "possession" that the trial court gave to the jury, trial counsel said,

> I know that initially we were . . . asking for a really strong sort of concrete definition . . . I think perhaps it came down to a choice between something that the State wanted versus just common sense and I think we preferred common sense as the, as the choice was made to us.

-9-

Trial co-counsel testified that he had been an attorney with the public defender's office for fourteen years, that he had participated in about two trials per year, and that he and co-counsel met with the Petitioner "numerous" times. Their strategy was to show that the Petitioner was guilty of a lesser-included offense such as simple assault or aggravated assault and that the victim was not trustworthy. The defense hired Dr. Montgomery to evaluate the Petitioner, but a mental health defense did not develop from the evaluation. The Petitioner provided defense counsel with the names of a few witnesses, and counsel met with Leah White and Quentin Sherwood. Defense counsel had photographs of the Petitioner's truck, and their inability to inspect the truck did not affect the Petitioner's defense. Regarding jury selection, co-counsel explained, "I think we probably involved [the Petitioner] in the sense that usually [counsel] and I sit on either side of the client and sort of lean in and discuss the . . . jury selection process as we go in terms of strikes or in terms of what jurors are appropriate." The Petitioner was not feeling well at trial. Co-counsel said that if the Petitioner had been "that sick," co-counsel probably would have made a motion for a continuance. The definition of "possession" was important to the Petitioner's defense. Co-counsel said that the definition was an issue at trial but that "I don't recall exactly."

On cross-examination, co-counsel testified that the Petitioner was arrested in August 2006 and that the pickup truck was sold in December 2006. In April 2007, defense counsel looked for the truck and learned it had been sold. Co-counsel did not remember if photographs of the truck showed the inside of the cab. The Petitioner was taking some mental health medications before his arrest, but co-counsel did not know if the Petitioner received his medications in jail. As for jury selection, co-counsel said that "I don't think we have ever had a trial where we would have the client sit on one end or the other end." Co-counsel cross-examined Lieutenant Swisher at trial but did not remember if he objected to her testimony about domestic violence syndrome. He said he thought the defense filed "something pretrial about that" and that "I do remember [Lieutenant Swisher] spent a lot of time talking about that." The Petitioner did not testify at trial, and defense counsel did not make an offer of proof as to his proposed testimony. Co-counsel said that he did not object to the State's mentioning the Petitioner's guilty plea during closing arguments because the Petitioner "probably did that in front of the jury when the indictment was read I would guess, but I am not sure."

The post-conviction court filed a written order denying the petition for post-conviction relief. Regarding the Petitioner's claim that he did not participate in jury selection, the court noted that trial counsel and co-counsel testified that their general practice was to consult with a client during jury selection. The court found that the Petitioner's testimony about the issue was "doubtful" and concluded that he failed to establish he was prevented from participating in jury selection or was prejudiced by not participating. Regarding trial counsel's failure to inspect the pickup truck, the post-conviction court concluded that trial counsel's inability to

look over the truck was not detrimental to the defense because counsel viewed photographs of the truck. As to the Petitioner's claim that trial counsel failed to present evidence about his mental health to the jury, the court concluded that the Petitioner failed to establish deficient performance or prejudice because Dr. Montgomery's evaluation did not support a legal defense of insanity or incompetency.

Regarding the Petitioner's contention that trial counsel failed to cross-examine the victim effectively, the post-conviction court noted that it had reviewed the victim's testimony on cross-examination regarding her drug use, her being previously admitted into the hospital for a drug overdose, her taking the Petitioner's truck on the day of the crimes, and her driving the truck erratically in an attempt to throw him out of the truck. The court concluded that the Petitioner failed to establish that defense counsel rendered deficient performance or that the Petitioner was prejudiced by any deficiency.

As to the Petitioner's claim that he received the ineffective assistance of appellate counsel because counsel failed to consult with him, the post-conviction court found that although appellate counsel did not personally meet with the Petitioner, counsel communicated with him over the telephone. The court stated that appellate counsel was a "skilled and competent attorney who handles appellate work for the Davidson County Public Defender's Office" and concluded that the Petitioner failed to establish deficient performance or prejudice.

Next, the post-conviction court addressed the Petitioner's claim that he received the ineffective assistance of appellate counsel because counsel failed to raise certain issues on direct appeal. First, regarding the Petitioner's claim that appellate counsel failed to raise the admissibility of his prior theft conviction, the court stated only that counsel did not render deficient performance and that the Petitioner failed to establish prejudice. Second, the court found that appellate counsel was not ineffective for failing to raise the admissibility of the Petitioner's statement that "she kidnapped me" because the statement was not the product of an interrogation and, therefore, was admissible at trial. Third, as to counsel's failure to argue on appeal that the Petitioner's "be safe" statement was inadmissible pursuant to Rule 404(b), Tennessee Rules of Evidence, the post-conviction court found that although the victim interpreted the statement as a threat, she did not elaborate on a prior bad act. Fourth, as to counsel's failure to raise the inadmissibility of Lieutenant Swisher's testimony about domestic violence syndrome, the post-conviction court found that "Lieutenant Swisher was providing an explanation as to why the victim did not seek an order of protection against the Petitioner, and her answer was speculative in nature." The court noted that counsel was not required to raise every issue on appeal and that counsel's failure to raise the issue did not prejudice the Petitioner. Finally, regarding counsel's failure to raise the State's improper definition of "possession" and reference to his guilty plea to domestic assault during closing

arguments, the post-conviction court stated that it had reviewed the transcript of closing arguments and that the State did not refer to the definition. The post-conviction court also found that the State did not refer to the Petitioner's guilty plea during closing arguments and that, in any event, the Petitioner pled guilty to domestic assault in front of the jury on the morning of trial. The court noted that the trial court instructed the jury not to infer anything from the Petitioner's guilty plea. The post-conviction court concluded that the Petitioner failed to establish that he received the ineffective assistance of counsel on appeal or that he was prejudiced by any deficiency.

Lastly, the post-conviction court addressed the Petitioner's claims that his due process rights were violated when the State failed to preserve the truck, when the State allowed improper testimony from Lieutenant Swisher, when the trial court failed to provide a definition of "possession" to the jury, and when the jury convicted the Petitioner despite the insufficiency of the evidence. The court concluded that the Petitioner's allegations were "either waived for purposes of the Petitioner's Post-Conviction Petition or previously determined in a prior proceeding." The post-conviction court denied the petition for post-conviction relief.

## II. Analysis

To be successful in a claim for post-conviction relief, a petitioner must prove all factual allegations contained in his post-conviction petition by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). Issues regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual questions raised by the evidence adduced at trial are to be resolved by the post-conviction court as the trier of fact. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). Therefore, the post-conviction court's findings of fact are entitled to substantial deference on appeal unless the evidence preponderates against those findings. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001).

### A. Ineffective Assistance of Counsel

A claim of ineffective assistance of counsel is a mixed question of law and fact. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). We will review the post-conviction court's findings of fact de novo with a presumption that those findings are correct. See Fields, 40 S.W.3d at 458. However, we will review the post-conviction court's conclusions of law purely de novo. Id.

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, "the petitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). To establish deficient performance, the petitioner must show that counsel's performance was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). To establish prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. Notably,

> [b]ecause a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component.

Goad, 938 S.W.2d at 370 (citing Strickland, 466 U.S. at 697).

## 1. Trial Counsel

The Petitioner contends that he received the ineffective assistance of counsel at trial because trial counsel failed to allow him to participate in jury selection; failed to inspect his truck before it was sold; failed to present evidence regarding his mental health; and failed to cross-examine the victim effectively about her drug use, previous admission to the hospital for a drug overdose, taking the Petitioner's truck, and trying to throw the Petitioner out of the truck.

The post-conviction court specifically accredited trial counsels' testimony that the Petitioner sat between them and had the opportunity to express his concerns about potential jurors. Neither counsel nor co-counsel remembered the Petitioner asking that a potential juror be removed from the panel. In any event, even assuming that the Petitioner was not allowed to participate in jury selection, the Petitioner has not explained how any specific juror resulted in his receiving an unfair trial. Therefore, he has failed to show that he was prejudiced by his alleged inability to participate in jury selection. Regarding the Petitioner's truck, counsel testified that they wanted to inspect the truck but learned it had been sold. Counsel looked at photographs of the vehicle, and co-counsel testified that their inability to inspect the truck did not affect the Petitioner's defense. We note that the State introduced a photograph of the bed of the truck and a photograph of the knife lying on the passenger seat

-13-

into evidence at trial. The Petitioner has failed to show that counsel's being unable to inspect the truck prejudiced his case. Regarding his mental health, the Petitioner again has failed to demonstrate that he received the ineffective assistance of counsel or that he was prejudiced by any deficiency because his mental health examination did not provide a defense to the crime.

As to the Petitioner's claims that trial counsel failed to cross-examine the victim effectively, we have carefully reviewed the trial transcript. On cross-examination, the victim testified that on the day of the crimes, she and the Petitioner argued "about being out of drugs and not having no money to get no more." She also testified that she and the Petitioner used drugs throughout the day and that she smoked crack cocaine more than one time. The victim testified that cocaine was a "[v]ery evil" drug and that she had trouble remembering details about the crimes because she was probably under the influence of drugs at the time of the crimes. The victim acknowledged that three weeks before the crimes, she was admitted to the hospital. At first, the victim maintained that she was admitted to the hospital because the Petitioner put his hands over her mouth and nose until she collapsed. However, upon further questioning by defense counsel, she acknowledged that drugs were found in her system and that she was diagnosed with an "apparent overdose." The victim also acknowledged on cross-examination that she took the Petitioner's truck on the night of the crimes and that he jumped into the truck bed. She said she slammed on the brakes and did "everything [she] could to get him out of the back of the truck." In our view, trial counsel adequately questioned the victim about her drug use and challenged her credibility. Therefore, we agree with the post-conviction court that the Petitioner has failed to show that counsel rendered deficient performance or that he was prejudiced by any deficiency.

2. Appellate Counsel

The Petitioner contends that he received the ineffective assistance of counsel on direct appeal because appellate counsel failed to establish a relationship with him and failed to raise the following issues: (1) the Petitioner's 2001 theft conviction was inadmissible for impeachment purposes; (2) the Petitioner's statement that "she kidnapped me" was inadmissible; (3) the victim's characterization of the Petitioner's "be safe" statement as a threat was inadmissible pursuant to Rule 404(b), Tennessee Rules of Evidence; (4) Lieutenant Swisher was allowed to give improper lay opinion testimony about the victim's suffering from domestic violence syndrome; and (5) during closing arguments, the State gave the jury "improper legal definitions" and referred to the Petitioner's guilty plea to domestic assault.

As to the Petitioner's claim that appellate counsel failed to establish a relationship with him, the evidence shows that appellate counsel did not meet with the Petitioner but

talked with him on the telephone. Appellate counsel also had access to the Petitioner's file and talked with trial counsel about the case. We agree with the post-conviction court that the Petitioner has failed to show that counsel's not meeting with him resulted in deficient performance or that he was prejudiced by any deficiency.

Regarding the Petitioner's 2001 theft conviction, the Petitioner has offered no explanation as to why his conviction was inadmissible for impeachment purposes. He also has not alleged that the use of his conviction resulted in his decision not to testify at trial. As to his statement to police that "she kidnapped me," the post-conviction court concluded that the statement was admissible at trial because the trial court ruled the Petitioner did not make the statement as part of a custodial interrogation. The Petitioner has failed to explain how the trial court erred. Similarly, the Petitioner has failed to offer any explanation as to why the Petitioner's "be safe" statement constitutes a prior bad act that would be inadmissible pursuant to 404(b), Tennessee Rules of Evidence. In order to show that appellate counsel rendered deficient performance for failing to raise these issues on direct appeal, the Petitioner must first show that the trial court erred in its rulings regarding the admissibility of the evidence. The Petitioner has made no attempt to do that in this case. Therefore, he has failed to demonstrate deficient performance or prejudice.

As to the improper testimony by Lieutenant Swisher, the Petitioner contends that the officer's testimony about domestic violence syndrome was inadmissible because she was never qualified as an expert. Initially, we note that we have reviewed Lieutenant Swisher's testimony and can find no portion of her direct testimony in which she mentioned domestic violence. On cross-examination, Lieutenant Swisher acknowledged that the victim did not want to go to the hospital and chose not to get an order of protection against the Petitioner. She explained that victims of domestic abuse often chose not to go to the hospital or get an order of protection because they were afraid. On redirect examination, the State asked the officer if she prosecuted this case on behalf of the victim. The officer answered, "I did. . . . In domestic violence cases --[.]" The defense interrupted her testimony and objected, and the trial court stated, "I don't think she needs to get into great detail about domestic violence cases." Lieutenant Swisher's testimony continued, and she said law enforcement could prosecute on behalf of a victim in certain cases. On re-cross examination, the officer acknowledged that she filled out a domestic violence form in this case and that she described the Petitioner on the form as "calm." She then explained that suspects in domestic violence cases often appeared calm because they did not think they had done anything wrong. In short, our review of the transcript reveals that Lieutenant Swisher's testimony about domestic violence occurred in response to questioning by the defense, not the State. Therefore, the issue would have been waived on direct appeal, and the Petitioner has failed to show that counsel rendered deficient performance.

Finally, the Petitioner contends that during closing arguments, the State gave "improper legal definitions" to the jury and improperly referred to his guilty plea to domestic assault. The Petitioner has not explained what illegal definitions the State gave to the jury. Moreover, our review of the trial transcript confirms that the State did not refer to the Petitioner's guilty plea in its closing argument. To the contrary, the Petitioner's co-counsel referred to the guilty plea during his closing argument, stating, "You saw him plead guilty before you to domestic assault. . . . Mr. Estill accepted responsibility for that." Therefore, appellate counsel did not render deficient performance by failing to raise the issue on direct appeal.

## B. Cumulative Error

Next, the Petitioner contends that he is entitled to relief based upon cumulative error. Specifically, he argues that trial counsel's failure to investigate the truck, failure to challenge the victim's testimony, and failure to present any evidence on his behalf demonstrates that he is entitled to relief based upon the cumulative error doctrine. However, the Petitioner has not shown any error. Therefore, he is not entitled to relief.

## C. Due Process

Finally, the Petitioner contends that the post-conviction court failed to address sufficiently his claims of due process violations. In his petition, the Petitioner argued that he was denied his rights to due process when the State failed to maintain the pickup truck; the State allowed Lieutenant Swisher to testify that the victim suffered from domestic violence syndrome; the trial court failed to provide a proper definition of "possession" to the jury when the jury asked for a definition; and the jury convicted him against the weight of the evidence. However, the Petitioner failed to object to the State's preservation of the pickup truck and opened the door to Lieutenant Swisher's testimony about domestic violence. Moreover, on direct appeal, this court found that the trial court's definition of "possession" was harmless error and that the evidence was sufficient to support the conviction. Therefore, the post-conviction court properly concluded that the issues were waived or previously determined.

## III.  Conclusion

Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgment of the post-conviction court.

_____

NORMA McGEE OGLE, JUDGE

-16-